THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY L. AUSTIN *et al.*, Defendants-Appellants.

Second District   Nos. 82—660, 82—663 cons.

Opinion filed April 24, 1984.—Rehearing denied May 31, 1984.

John S. Biallas, of St. Charles, and Randy Johnson, of Elgin, for appellants.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Defendant, Larry Austin, was convicted of murder, two counts of felony murder, burglary and home invasion following a jury trial in the circuit court of Kane County. In a separate jury trial in the circuit court of Kane County, defendant, Phillip Gillespie, was convicted of home invasion and three counts of aggravated battery arising out of the same events. We agreed to consolidate the defendants' separate appeals pursuant to a stipulation of the parties. On appeal, defendants contend: (1) that they were not proved guilty of home invasion beyond a reasonable doubt; and, (2) that the trial court erred in granting the State's motion *in limine* precluding inquiry as to the citizenship of certain of the State's witnesses. Additionally, defendant Austin con-

tends that the admission of certain statements made by him after his arrest was in violation of Supreme Court Rule 402(f) (87 Ill. 2d R. 402(f)).

On the evening of December 23, 1981, a number of Hispanic men were gathered in an apartment at 321 Center Street, Elgin, Illinois. This apartment was the dwelling of Marcial Escobar. The men had been drinking, playing cards, and gambling. During the course of the evening, a woman was at the apartment, apparently for purposes of prostitution. She left and returned, accompanied by another woman and a man. These three people, who were not identified, left after a brief time. Approximately one hour later, two other men, identified in their respective trials as defendants, came to the apartment and entered by kicking the door open. Austin was carrying a .22-caliber rifle, and Gillespie a shotgun. Upon entering the apartment, the two men yelled something and fired the guns. Defendant Austin allegedly shot first, wounding Eustorgio Calixto, who later died of his wounds. Gillespie then fired his weapon, hitting Jose Covarubias. Several other men also were shot, including Marcial Escobar and Margarito Aguirre, but it is not clear which defendant fired these shots. Covarubias, Aguirre, and another man grabbed Gillespie, taking the shotgun, and held him until police arrived. Austin fled the scene, continuing to fire his weapon from outside the apartment.

On January 13, 1982, Austin was placed under arrest and was advised of his *Miranda* rights. Later that day, at the request of Austin, a conversation was held between Austin and Captain Smith of the Elgin police department. Officer David Jensen was also present. Austin asked Smith if he could get the death penalty for his crime and Smith replied that the death penalty did apply but that that was the State's Attorney's decision to make. Defendant stated he did not want to get the death penalty, and Captain Smith advised that before any decision could be made, Austin would have to go through his rights again and talk to his attorney. Defendant indicated he wanted to think about whether to talk with the assistant State's Attorney.

Captain Smith on his own initiative contacted the assistant State's Attorney, indicating that Austin might make a statement. The next morning, on January 14, 1982, defendant was introduced to Mr. Van Der Snick, the assistant State's Attorney. In the conversation which followed, Austin stated that he wanted to make sure that the two girls did not get charged with murder, and that he did not want to get the death penalty. The *Miranda* warnings were repeated, both orally and in writing, and Austin indicated that he understood each of his rights. He then repeated his inquiries to the State's Attorney re-

garding the death penalty and the fate of the two women. Mr. Van Der Snick advised Austin that he would not seek the death penalty and that he could not discuss the fate of the two women until further investigation was made. Austin then gave a taped statement which was later transcribed and signed.

The juries respectively found defendant Austin guilty of murder, two counts of felony murder, burglary, and home invasion, and defendant Gillespie guilty of home invasion and the aggravated batteries of Escobar, Covarubias, and Aguirre. Austin's convictions for felony murder were subsequently vacated, and judgment was entered on the remaining verdicts in both cases. Defendant's post-trial motions were denied. Austin was sentenced to concurrent terms of 20 years' imprisonment in the Department of Corrections for murder, 20 years for home invasion and seven years for burglary. Gillespie was sentenced to concurrent terms of 20 years' imprisonment for home invasion and five years' imprisonment for each aggravated battery conviction.

We first address defendant Austin's contention that his inculpatory statements to the police made after his arrest on January 13, 1982, were admitted into evidence in violation of Supreme Court Rule 402(f) (87 Ill. 2d R. 402(f)). That rule provides that any plea discussion not resulting in a guilty plea is inadmissible against the defendant. Defendant argues that his statements to the police and the assistant State's Attorney were in the nature of plea negotiations and were therefore inadmissible.

The purpose of Supreme Court Rule 402(f) is to encourage the negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussions at his peril. (*People v. Hill* (1980), 78 Ill. 2d 465, 472, 401 N.E.2d 517; *People v. Friedman* (1980), 79 Ill. 2d 341, 351, 403 N.E.2d 229.) However, not all statements made with the hope of some concession are necessarily plea discussions. (*People v. Victory* (1981), 94 Ill. App. 3d 719, 722, 419 N.E.2d 73.) In *People v. Friedman* (1980), 79 Ill. 2d 341, 403 N.E.2d 229, the court recognized that there is a distinction between a statement made in the furtherance of a plea discussion and an otherwise independent admission which is not excluded by the rule. (79 Ill. 2d 341, 353, 403 N.E.2d 229; see also *People v. Victory* (1981), 94 Ill. App. 3d 719, 419 N.E.2d 73.) The *Friedman* court established a two-prong test for determining whether a defendant's unsolicited statement was plea-related and therefore inadmissible. First, the court must consider whether the accused exhibited a subjective expectation to negotiate a plea, and, second, it must determine whether this ex-

pectation was reasonable under the totality of the objective circumstances. (*People v. Friedman* (1980), 79 Ill. 2d 341, 351, 403 N.E.2d 229.) Where the defendant's subjective expectations are not explicit, the objective circumstances surrounding defendant's statement take precedence in evaluating defendant's subsequent claim that the statement was plea related. (*People v. Friedman* (1980), 79 Ill. 2d 341, 353, 403 N.E.2d 229.) The *Friedman* court noted that "[b]efore a discussion can be characterized as plea related, it must contain the rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State." 79 Ill. 2d 341, 353, 403 N.E.2d 229.

In the present case, any subjective expectation to negotiate a plea was not explicit. Defendant never requested of either the police or the assistant State's Attorney to "make a deal" (*cf. People v. Hill* (1980), 78 Ill. 2d 465, 401 N.E.2d 517; *People v. Friedman* (1980), 79 Ill. 2d 341, 403 N.E.2d 229), nor did he ever convey to them any offer to plea bargain (see *People v. Victory* (1981), 94 Ill. App. 3d 719, 723, 419 N.E.2d 73). Defendant did not ask Captain Smith to contact the State's Attorney for him, and he did not testify as to what his expectations were. (94 Ill. App. 3d 719, 723, 419 N.E.2d 73.) Under these circumstances, the objective facts surrounding defendant's statements take precedence in evaluating defendant's claim that his statements were plea related. *People v. Friedman* (1980), 79 Ill. 2d 341, 353, 403 N.E.2d 229.

Two of defendant Austin's statements apparently are in question here. Defendant's initial statement to Captain Smith inquiring as to whether the death penalty applied in his case was, in our opinion, merely a statement indicating defendant's concern over his fate and was designed to elicit Smith's opinion on that rather than to initiate plea negotiations. (See *People v. Victory* (1981), 94 Ill. App. 3d 719, 419 N.E.2d 73, wherein defendant asked an officer whether the State's Attorney would be willing to plea bargain because defendant could not "afford to take an armed robbery charge.") We consider defendant's statement here as more in the nature of an admission of guilty knowledge rather than a subjective expectation or attempt to enter into plea discussions. 94 Ill. App. 3d 719, 724, 419 N.E.2d 73.

■ Similarly, defendant's statement to the assistant State's Attorney regarding the fate of the two women and the applicability of the death penalty cannot be characterized as "plea-related" under Supreme Court Rule 402(f) (87 Ill. 2d R. 402(f)). That statement was given after he had already received assurances from the State's Attorney that the death penalty would not be sought. The State's Attor-

ney also advised defendant prior to his statement that the fate of the two women could not be discussed at that time. Thus, with respect to this second statement, it cannot be said that the "rudiments of the negotiation process" were present. (*People v. Friedman* (1980), 79 Ill. 2d 341, 353, 403 N.E.2d 229.) Defendant at no time indicated a willingness to enter a plea of guilty in return for concessions by the State. The State's assurances were received prior to, and independent of, defendant's subsequent incriminating statement. There was no testimony supporting defendant's position that leniency would be granted only upon the condition that defendant confess to the crime. There were no offers made by either defendant or the State's Attorney in relation to an entry of a plea of guilty. In fact, there was no real negotiating process at all. Under these circumstances, we believe the trial court's admission of the statements was not error.

■ Next we consider the defendants' contention that they were not proved guilty of home invasion beyond a reasonable doubt. A person who is not a peace officer acting in the line of duty commits home invasion when, without authority, he or she knowingly enters the dwelling place of another at a time when he or she knows or has reason to know that one or more persons are present inside and (1) while armed with a dangerous weapon uses or threatens force against any person within the dwelling or (2) intentionally causes injury to any person within the dwelling. (Ill. Rev. Stat. 1981, ch. 38, par. 12—11.) The records establish that defendants entered the apartment, in which Marcial Escobar lived, without authority. They were not police officers executing their duties. They were armed with a shotgun and a rifle, each of which was fired, and each defendant hit at least one of the persons inside the apartment. Several of the other occupants also were injured, although it is not clear which of the assailants fired the shots which caused these injuries. However, defendants claim they were not proved guilty beyond a reasonable doubt as there was insufficient evidence to show that they knew or had reason to know that there were people inside the apartment.

Under section 4—5 of the Criminal Code of 1961, knowledge of a material fact includes "awareness of the substantial probability that such fact exists." (Ill. Rev. Stat. 1981, ch. 38, par. 4—5.) Because of its very nature, knowledge is ordinarily proven by circumstantial evidence, rather than by direct proof. (*People v. Farrokhi* (1980), 91 Ill. App. 3d 421, 427, 414 N.E.2d 921.) However, the State must present sufficient evidence from which an inference of knowledge can be made, as the inference must be based on established facts and not pyramided on an intervening inference. *People v. Davis* (1977), 50 Ill.

App. 3d 163, 168, 365 N.E.2d 1135.

In the instant case, there is sufficient circumstantial evidence that defendants knew or had reason to know that one or more persons were present when they entered the apartment. They entered the apartment between midnight and 1:30 a.m., a time when it is likely that the occupants of a residence would be at home. (See *People v. Davis* (1982), 106 Ill. App. 3d 260, 267, 435 N.E.2d 838.) At that time 13 or more men were in the apartment, drinking, playing cards, and gambling. Under these circumstances, the jury could have inferred that lights were on and that noise was emanating from the apartment, thus putting defendants on notice of the presence of persons inside. (See *People v. Davis* (1982), 106 Ill. App. 3d 260, 435 N.E.2d 838; *People v. Pavic* (1982), 104 Ill. App. 3d 436, 432 N.E.2d 1074.) Additionally, defendants' own behavior indicated that they knew that people were in the apartment. (See *People v. Davis* (1982), 106 Ill. App. 3d 260, 267, 435 N.E.2d 838.) Defendants were both carrying firearms. They kicked open the door and stood at the entryway pointing their guns. Apparently, the two men began shooting immediately and fired between 10 and 20 shots. Gillespie, who had a loaded shotgun, also had a buck knife and live ammunition in his pockets. These actions strongly suggest that defendants were anticipating that the apartment was occupied and that the occupants might give them some resistance. Therefore, the proof of defendants' mental state was sufficient even though they apparently had not been in the apartment previously that evening and there was nothing to connect defendants to the three other persons who had been in the apartment an hour prior to the attack, other than their common racial background.

■ Defendants note that, contrary to the allegations of the indictments, there was no evidence that they knew specifically of the presence of Marcial Escobar. The prosecution must prove the essential elements of a charging instrument (*People v. Rothermel* (1982), 88 Ill. 2d 541, 544, 431 N.E.2d 378), as alleged and without variance. (*People v. Mosby* (1962), 25 Ill. 2d 400, 403, 185 N.E.2d 152.) However, a variance or lack of proof of facts alleged is not fatal if the facts in question are not essential elements of the crime charged. (*People v. Alexander* (1982), 93 Ill. 2d 73, 77, 442 N.E.2d 887; *People v. Rothermel* (1982), 88 Ill. 2d 541, 341 N.E.2d 378; *People v. Davis* (1980), 82 Ill. 2d 534, 539, 413 N.E.2d 413.) Defendants, citing *People v. Mosby* (1962), 25 Ill. 2d 400, 185 N.E.2d 152, assert that the identity of the persons in the apartment was an essential allegation which had to be proved without variance. In *Mosby*, the court held that ownership or possession of a burglarized dwelling was an essential ele-

ment of a burglary indictment and that the State's failure to prove ownership as alleged was a fatal defect. (25 Ill. 2d 400, 403, 185 N.E.2d 152.) However, this is no longer an accurate statement of the law, and failure to allege ownership or to prove ownership as alleged in a burglary charge does not defeat the charge unless the defendant was harmed in preparing a defense. (*People v. Rothermel* (1982), 88 Ill. 2d 541, 545, 431 N.E.2d 378.) We think this same rationale applies to a home-invasion charge, where the gravamen of the offense is entering a dwelling without authority knowing that *someone* is present inside. As such, the allegation naming a specific person was merely surplusage, which generally does not affect the validity of a conviction. (See *People v. Davis* (1980), 82 Ill. 2d 534, 539, 413 N.E.2d 413.) As defendants have not claimed they were prejudiced in the preparation of their defenses, and since the indictments as drawn contain sufficient information to prevent further jeopardy (see *People v. Clark* (1979), 71 Ill. App. 3d 381, 419, 389 N.E.2d 911), the failure to prove that defendants specifically knew of Escobar's presence does not vitiate the convictions.

■ Finally, defendants contend that their right to cross-examination was improperly restricted when the trial court granted the State's motions *in limine* asking the court to prohibit defense counsel from eliciting any evidence during trial of the citizenship status of the State's Hispanic witnesses. In support of the motion in defendant Gillespie's trial, the prosecutor stated that he and defense counsel "are both aware of where [the Hispanic witnesses] will be going." Ten days later, during defendant Austin's trial, the same prosecutor stated that it was his "understanding that they are illegals and that they are attempting to gain residency." After a reference to the witness-victims' right to plead the fifth amendment on that issue and the State's desire to avoid a mistrial, the court granted the motion and the cause proceeded to trial. Defendants claim that they should have been permitted to inquire as to whether these witnesses were illegal aliens, as this status might have given the witnesses a motive to testify favorably for the State. We agree, but find the error to be harmless under the facts presented here.

A criminal defendant has a constitutional right to be confronted with the witnesses against him or her. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, sec. 8.) This right encompasses the right to effective cross-examination to test the credibility of the witnesses and the truth of their testimony. (*Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.) Because the exposure of any bias, interest, or motive to testify falsely on the part of a witness is an impor-

tant function of cross-examination, cross-examination for these purposes is a matter of right, subject only to the trial court's broad discretion to preclude repetitive and unduly harassing interrogation. (415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105; *People v. Foley* (1982), 109 Ill. App. 3d 1010, 1015, 441 N.E.2d 655.) This right requires that defense counsel be permitted to expose to the jury facts from which it could appropriately draw inferences concerning the reliability of the State's witnesses. (*People v. Betts* (1983), 116 Ill. App. 3d 551, 555, 451 N.E.2d 1028.) It is only after this standard has been satisfied that the trial court's generally broad discretion to restrict the scope of cross-examination (see *People v. Pizzi* (1981), 94 Ill. App. 3d 415, 418 N.E.2d 1024) comes into play. (*People v. Betts* (1983), 116 Ill. App. 3d 551, 555, 451 N.E.2d 1028; *People v. Rufus* (1982), 104 Ill. App. 3d 467, 473, 432 N.E.2d 1089.) However, even then, the defendant has a common law right, based on evidentiary principles, to cross-examine an adverse witness to reveal any possible bias, interest, or motive to testify falsely (*People v. Rufus* (1982), 104 Ill. App. 3d 467, 474, 432 N.E.2d 1089; *People v. Thompson* (1979), 75 Ill. App. 3d 901, 903, 394 N.E.2d 422), and the defendant should be given the widest latitude in such cross-examination. *People v. Betts* (1983), 116 Ill. App. 3d 551, 555, 451 N.E.2d 1028; *People v. Foley* (1982), 109 Ill. App. 3d 1010, 1014, 441 N.E.2d 655.

The State first argues that defendants have waived review of this issue because their objections were not based on the ground now urged on appeal. (*People v. Baker* (1983), 114 Ill. App. 3d 803, 807, 448 N.E.2d 631.) Rather, they objected on the general ground that they had a right to bring out the background of the witnesses. While it is true that the specific issue of bias was not raised by defendants, we nevertheless consider the issue under the plain-error rule (87 Ill. 2d R. 615(a)), since, for the reasons which follow, we believe it was error not to allow cross-examination on this point.

The fact that a prosecution witness has charges pending against him or her or is on probation indicates a possibility that the witness might attempt to curry favor with the government by testifying for the State. (*Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105; *People v. Betts* (1983), 116 Ill. App. 3d 551, 451 N.E.2d 1028; *People v. Foley* (1982), 109 Ill. App. 3d 1010, 441 N.E.2d 655; *People v. Rufus* (1982), 104 Ill. App. 3d 467, 432 N.E.2d 1089; *People v. Freeman* (1981), 100 Ill. App. 3d 478, 426 N.E.2d 1220.) Generally, the defendant need not make a prior showing that any promises of leniency have been made or that any expectations of special favor actually exist in the witness' mind. (*People v. Betts* (1983), 116 Ill. App. 3d

551, 555, 451 N.E.2d 1028; *People v. Foley* (1982), 109 Ill. App. 3d 1010, 1015, 441 N.E.2d 655; *People v. Freeman* (1981), 100 Ill. App. 3d 478, 481, 426 N.E.2d 1220.) The key factor is not the existence of actual pressure, but the witness' state of mind. (*People v. Baugh* (1981), 96 Ill. App. 3d 946, 951, 422 N.E.2d 166.) Where the witness is in a position to contemplate the possibility of leniency or favor, the defendant should be allowed to question the witness concerning these matters. *People v. Baugh* (1981), 96 Ill. App. 3d 946, 951, 422 N.E.2d 166.

We think an illegal alien, like a probationer, might be vulnerable to pressure, real or imagined, from the authorities. (See *People v. Foley* (1982), 109 Ill. App. 3d 1010, 1014, 441 N.E.2d 655.) This may be true even though no deportation proceedings actually have been brought. (See *People v. Baugh* (1981), 96 Ill. App. 3d 946, 951, 422 N.E.2d 166.) Thus, we believe defendant was entitled to present to the jury the residency status of the State's witnesses and argue bias if all or some of these witnesses were in fact illegal aliens. This court cannot speculate as to whether the jury would have accepted such a theory. See *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.

■ Nevertheless, we believe the error was harmless here since the evidence against the defendants was overwhelming. The Hispanic witnesses provided the evidence of defendants' unlawful entry into the apartment and behavior upon entering. However, police investigating the scene found that the door to the apartment had been forced open. Several men were holding defendant Gillespie down when police arrived. Gillespie was struggling, and a sawed-off shotgun was on the floor next to him. Upon patting Gillespie down, the arresting officer found live ammunition for this weapon in defendant's pockets. He also had a buck knife. One man was killed as the result of this incident. While Gillespie was acquitted of murder, the use of force against the decedent could be used to support his conviction for home invasion. Additionally, Gillespie admitted to police that he had been in the apartment, identified two other people involved in the offense, and asked one officer whether he could arrange for defendant to get probation instead of imprisonment. Under these circumstances, any error in the limitation of cross-examination was clearly harmless beyond a reasonable doubt as to Gillespie.

Similarly, there was overwhelming evidence against Austin to sustain his conviction for murder. Austin's own statement admitted that he entered the apartment armed with a .22-caliber rifle and fired several shots into the crowded room. This fact is sufficient in and of it-

self to establish the requisite intent for murder. (*People v. Bartall* (1983), 98 Ill. 2d 294, 307, 456 N.E.2d 59.) A search of the area and the Hispanic witnesses by Officer Kelly revealed no weapons that would indicate the shots were fired by them, as Austin suggested at trial. The ballistics testimony indicated that the two shots which killed Calixto were fired from a .22-caliber rifle, as were all the spent casings recovered from the scene. Thus, there was sufficient corroboration of the witnesses by other testimony and the physical evidence in the case to establish any error as harmless beyond a reasonable doubt.

Accordingly, the judgments of the circuit court of Kane County are affirmed.

Affirmed.

NASH and VAN DEUSEN, JJ., concur.